## Case No. 1,246.

### BELL et al. v. CUNNINGHAM et al.

### [1 Sumn. 89.] [1]

Circuit Court, D. Massachusetts. May Term, 1831.

INJUNCTION—ENJOINING JUDGMENT AGAINST FOR-
EIGNERS — SURPRISE — WANT OF NOTICE OF IS-
SUES.

1. A court of equity will grant an injunction pro tanto to so much of a judgment as has been recovered by surprise of the defendant at a trial, when he had a good defence to it, but had no notice of the claim, even though the plaintiffs in the suit were in no default, and acted bona fide.

[See Roach v. Hulings, Case No. 11,874.]

2. Where foreigners are concerned, and have a good defence at law, unknown to their counsel, and the declaration is so amended at the trial as to let in a new claim, a court of equity will on due proof give them the benefit of such defence and grant an injunction pro tanto to the judgment at law.

In equity. This was a bill [by James C. Bell and others against John A. Cunningham and William J. Loring] for an injunction to a judgment at law in this court between the same parties, and for other relief. [Granted.] The case is reported in 5 Mason, 161, [Case No. 3,479;] and, having been carried by writ of error to the supreme court of the United States, will be found still more fully reported in [Bell v. Cunningham,] 3 Pet. [28 U. S.] 69.

The facts now necessary to be stated to explain the grounds upon which this bill was brought, and upon which the judgment of the court in the present case was founded, were as follows:—The defendants were owners of the brig Halcyon, and contemplating a voyage from Boston to Havana, and from thence to Leghorn, wrote a letter to the plaintiffs, the material parts of which are as follows:—"Boston, September 15, 1824. Messrs. Bell, De Youngh & Co. Gentlemen, This will be handed to you by Captain J. Skinner, master of the brig Halcyon, belonging to us. We have contracted with Messrs. Atkinson & Rollins of this place to furnish 600 boxes (of sugar) from Havana to Leghorn, on freight of £4. 10s. and five per cent. primage payable in a bill on London, &c., and 600 boxes on half profits, for freight, 1000 pezzos to be paid in Leghorn, on account of said profits. As the goods are to be consigned to you, we mention the terms of contract to avoid misunderstanding. The whole amount of freight receivable in Leghorn will be about 4600 pezzos. Please invest 2200 pezzos in marble tiles of 12, 14, and 16 oz., &c. The balance, after paying disbursements, please invest in wrapping-paper, to cost from 35 to 50 pezzos per 100 reams," &c. To this letter, which went by the Halcyon,

there was a postscript added. "P. S. We have further engaged whatever may be necessary to fill the brig on half profits, on account of which 700 pezzos are to be paid in Leghorn. After purchasing the tiles, and paying the disbursements, you will invest the balance in paper, as before mentioned," &c.—The Halcyon sailed for Havana on the 16th of September. A duplicate of the above letter, without the postscript, was transmitted by the defendants to the plaintiffs, with a memorandum thereon of the 20th of September; and was received by them on the 30th of November, and answered on the 9th of December, agreeing to conform to the orders of the defendants. The postscript does not appear to have been known to the plaintiffs until the arrival of the Halcyon at Leghorn, on the 13th of January, 1825, with 1330 boxes of sugar. The 700 pezzos alluded to in the postscript were to be advanced on a shipment made by one Charles Torrey. On the 17th of September, 1824, at Boston, he addressed a letter to the plaintiffs, in which he states, "Duplicate. I have also directed them (Messrs. Murdock, Storey, & Co.) to ship per brig Halcyon, Captain Skinner, on my account, 150 boxes brown sugar on freight, and moreover 150 boxes assorted sugars on half profits, or more if required to fill up, and not to exceed 200 boxes. These two adventures you will please keep distinct with a view to determine the profits on the assorted sugars, &c. You will please credit Messrs. Loring, Cunningham, & Co. (the defendants) 1700 pezzos, provided it shall appear to you probable, that one half of the net profits on the assorted sugars will amount to that sum. Should it appear likely, however, that the half profits will fall short of this amount, you will place to their credit that amount, which, in your opinion, will be equal to one half the net profits on the assorted sugars, &c. The Halcyon sailed yesterday for Havana, &c." This letter was received by the plaintiffs on the 17th of November, and subsequently answered. The above letter of Charles Torrey was not introduced at the former trial.

William Sullivan, for plaintiffs, claimed relief under the present bill on the following grounds:—1. That he was surprised at the former trial by the claim upon the plaintiffs for the non-investment of the 700 pezzos, and was not therefore prepared to meet it. 2. That he was at that time entirely ignorant of the existence of any such orders as were contained in Torrey's letter; had he been acquainted with which, and introduced the letter at the former trial, it would have defeated the defendants' claim for damages for the non-investment of the 700 pezzos. The grounds taken by the plaintiffs' counsel being fully canvassed and confirmed by the opinion of the court, his argument is omitted.

[1] [Reported by Charles Sumner, Esq.]

Charles G. Loring, for defendants.

The first point taken by the plaintiffs is, that they were surprised by the claim upon them for the non-investment of the 700 pezzos, at the trial, and were not therefore prepared to meet it. This cannot be truly said. The original count was for the non-investment of 2200 pezzos in tiles; and, although the other parts of the contract were not set forth, they were known to the plaintiffs as well as to the defendants. The plaintiffs evidently had notice that the defendants claimed damages to that extent, and of course had notice to produce all the evidence in their power to show that they were unable to invest the 2200 pezzos, or were justified in omitting to do so. And it was under this count that all the evidence in the case was taken. The plaintiffs, then, knowing that the defendants claimed damages for the non-investment of the 2200 pezzos, must have known that these 700 pezzos were included in the estimate; for in the duplicate letter first received by them, which had not the postscript, they were informed that they would receive 4600 pezzos; and when the original letter with the postscript arrived, they received also the freight list, and at once saw that the 700 were necessary to make up the 4600. When, therefore, they were sued for the non-investment of 2200 pezzos for the whole amount originally ordered to be invested, they must have known that the defendants intended to claim damages for the non-investment of the 700 pezzos, thus expressly directed by them, when the orders were given, to constitute a portion of the 4600, out of which these 2200 were to be taken. But this notice is put beyond all question by the letter of the defendants, under date of the 18th of April, 1825, in which they expressly allege the non-investment of these 700 pezzos, as one ground of complaint. It is clear, therefore, that here was no such surprise as would have entitled the plaintiffs to a new trial on motion; they had full knowledge of the claim and personal possession of the evidence. If they could have claimed any right, it could have been only that of a continuance on the ground of surprise:—they went on in the trial, and this is an afterthought of which they would now avail themselves. A court of equity will not relieve where a defence might have been made at law, unless the party was prevented from making it by fraud, or pure accident unmixed with any fault or negligence of himself or his agents. Marine Ins. Co. v. Hodgson, 7 Cranch, [11 U. S.] 336; Ware v. Horwood, 14 Ves. 30; Bateman v. Willoe, 1 Sch. & L. 201; 6 Johns. Ch. 235; Eden. Inj. 10; Grant, N. Trials, 113, and onward. There can be no pretence of fraud on the part of the defendants; none is alleged. Nor can there be any of concealment; for it is proved by the plaintiffs' own witnesses, that the defendants inquired for and sought to obtain the letters and bills of lading before they did. If there was any concealment, it was on the part of the plaintiffs, who had possession of the letter all the time. There being then no surprise, no fraud, and no concealment, on what ground can relief be granted? Nor can this be called newly discovered evidence, for it was in the plaintiffs' own knowledge and possession.

The second ground upon which relief is claimed is, that the facts now proved, if proved at the trial, would have defeated the defendants' claim for damages for the non-investment of the 700 pezzos. We contend, on the contrary, that the facts now proved, so far from invalidating the verdict in this particular, prove conclusively its justness. The inquiry is not, what effect the production of Torrey's letter might have had upon the jury, the defendants having then no means of refuting it, but whether, upon the case now made out to the court, the plaintiffs are entitled to relief. Now, upon the evidence, it is clear that the contract between Torrey and the defendants was, that the 700 pezzos should be advanced in Leghorn. The bill charges the contrary, but the answer meets and denies the charge in unqualified terms. The only witness in support of the bill is Torrey; but he testifies with caution as to what was his understanding of the contract. The defendants swear absolutely and unequivocally. Torrey's testimony is corroborated by his letter; but the defendants' answer is equally so by their letter to the plaintiffs and their instructions to the master, which are full and explicit to this point. All the collateral circumstances tend to show the truth of the answer, and that Torrey is in error;—the object of the voyage, predicated wholly on the freight to be received at Leghorn; the investment in tiles ordered to be made before the ship's arrival, to be paid for out of her freight; the ordering by the defendants of an investment of 4600 pezzos before the contract was made with Torrey about these 700, which were necessary to make up their funds. The contract was reasonable on the part of Torrey, as he would not have made a shipment unless confident that his sugars would at least yield a common freight, and necessary on the part of the defendants to enable them to fulfil their engagements with the plaintiffs.

It is clear that the contract made between Torrey's agents at Havana, the place of shipment, and the master of the defendants' vessel, was the same. The shipment was actually made on these terms. The bill of lading refers to an agreement; that agreement was specifically set forth in the captain's orders, and must have been that referred to in the bill of lading; there is no pretence that any other was known or thought of by Torrey's agents or the master. The freight list confirms this view. Whatever, then, might have

been the contract here, the shipment was made on these terms; and we contend strenuously, that the actual terms of the shipment must determine the rights of the parties. And from these positions the duty of the plaintiffs is plainly inferrible. They were the consignees of the defendants' ship, and of Torrey's sugars; and had different instructions from each party plainly inconsistent. And if they could not conform to either, without risk of responsibility to the other, they could have avoided it effectually by refusing the consignment of the one and conforming to the orders of the other; and, whichever they thus accepted, the rights of the defendants would have been preserved. Thus, if they had refused the consignment of the sugars, as consignees of the vessel, they would have retained through the master their lien on them until the 700 pezzos should be advanced by any other consignee whom the master should have appointed; and if they had refused the consignment of the vessel, the master and the other consignee of her would not have delivered the sugars until such payment.

If, on the other hand, they chose to take upon themselves the responsibility of deciding, they did so at their peril, and must take the consequences; and, as it now appears that they decided against the lawful right, they must indemnify the party injured. This view, which presupposes an equality in the contracts made between the plaintiffs and Torrey, and the defendants, is the strongest that can be taken for the plaintiffs; but they do not stand on so strong ground; the contract between them and the defendants was prior in time, and therefore of superior obligation, and they could not voluntarily enter into one with Torrey inconsistent with it; they had formerly agreed to accept the consignment of the vessel, with orders to receive the 700 pezzos out of their sugars, and could not be relieved from it by him. If, then, the contract between Torrey and the defendants was as we allege, it is clear that the plaintiffs were justly liable to them according to the verdict. But, if it were now doubtful what that contract was, the result would have been the same; for the bill of lading determined it as to the plaintiffs, and they were bound to conform to it; it referred to the agreement between Torrey and the defendants, and that agreement was set forth in the master's instructions, which they doubtless saw, or at least were bound to see, if they had any doubts, as they must have had when receiving different directions from Torrey and the defendants. This was the legal documentary evidence of the terms upon which the shipment was actually made; and could for ever protect the plaintiffs from all liability to Torrey, had they conformed to them. If the bill of lading had expressed that the sugars were deliverable on payment

of 700 pezzos, could the plaintiffs have justified themselves in not requiring payment because the letter of instructions from Torrey contained different orders? Surely not. And the bill of lading referring to the agreement is equally conclusive and obligatory.

Again. Admitting for the sake of the argument, that no binding contract was actually made, here or at Havana, between Torrey and the defendants, still the plaintiffs were bound to obey the orders' of the defendants, and not of Torrey, and for this obvious reason. The defendants, as owners of the ship, had the power of enforcing the contract according to their construction of it, by retaining the sugars until the 700 pezzos were paid; nor would it have been possible for Torrey, or his agents, to have obtained them otherwise; and the plaintiffs had no right to waive that advantage. They ought to have refused the consignment of the ship, or of the sugars, and thus have left the parties to their legal remedies. They had no right, by accepting both, to change the respective situations of their constituents, and to take from the defendants this power of enforcing the contract according to their construction, and transfer this power to Torrey to enforce it according to his. And, if they accepted both consignments, they were bound to do so without thus changing the remedial relations of the parties. In such cases, if the true contract be not clearly ascertainable, "potior est conditio possidentis;" and any agent, who should destroy that condition, and yield the advantage, should be made answerable to his employer. The hardship of a contrary construction in this case is most manifest, as the defendants will thereby not only lose their remedy against the plaintiffs, but can have none against Torrey, as they can have no evidence by which to prove the contract as stated by them; the means of proving it in this case not being available to them in a suit upon it against him; so that, by the misconduct of the plaintiffs, the defendants sustain a great loss without any remedy.

STORY, Circuit Justice. The case in equity is substantially narrowed down to the consideration, whether the former judgment, so far as regards the non-investment of the 700 pezzos stated in the case, is correct upon the new facts now alleged; and, if not, whether the defendants are entitled, upon the principles of a court of equity, to any relief. If either ground is against the plaintiffs, their bill fails; they can succeed only by establishing both grounds in their favor. There does not appear to have been a written agreement between Mr. Torrey and Messrs. Cunningham, Loring & Co., in respect to this shipment. Nor does it appear, that the plaintiffs had any other means of knowledge what it was, except from the

language of this letter, and from the post-script to the letter of the plaintiffs of the 1st of September. That the parties should in a matter resting wholly in parol, differ in respect to what were the terms of the shipment, the shipper supposing, that the advance of the 700 pezzos was to be conditional, and the owners of the Halcyon, that it was to be absolute, and at all events, is not surprising; for differences of this sort are of daily occurrence. But that in so important a contract no written paper should have been executed, and no joint instructions sent to the consignees, is truly matter of surprise, since it was the only effectual means of obviating possible difficulties. Indeed, there is no evidence, that Mr. Torrey ever saw the postscript to the letter of the defendants to the plaintiffs, and the defendants positively deny that they ever saw the letter of Torrey to the plaintiffs. If I were called upon to decide upon the whole transactions, whether the views taken of the contract of shipment by the defendants, or by Torrey, was a correct exposition of it, I confess, that the strong inclination of my mind would be, that the defendants truly expounded it. Still it is quite possible, that there might have been a very honest misconception of it by both parties, from the imperfect explanations given, and from the strong belief, in the then state of the market, on the part of the defendants, that the half profits must in every event exceed the 700 pezzos. Now the recovery against the plaintiffs having been for damages for the non-investment of the 700 pezzos, as well as the other funds, contrary to orders, it becomes important to consider, whether if these facts and the others now in the case had been before the court at the trial, the court would have authorized by its opinion the recovery of such damages. It is agreed on all sides, that there were no profits on the sugars, which would have justified the advance of the 700 pezzos. And the question turns upon this, whether the plaintiffs were, under the circumstances, bound to make it, and to invest the same accordingly.

It is very certain that the plaintiffs have not disobeyed the instructions given them by Mr. Torrey. They have acted in exact conformity to them. If the present judgment stands good against the plaintiffs, they have no remedy over for the same against Torrey. In what manner could they shape a claim against Torrey. They did not make any advance on his account. He did not authorize them to make any, except conditionally. And, whether in respect to Messrs. Cunningham, Loring, & Co. his orders conformed or not with his contract, was nothing to the plaintiffs. They had no right to bind him to a fulfilment of it. And if a recovery is now justifiable against the plaintiffs, it is because they have entered into a contract with the defendants to make an advance and investment under circumstances not authorized by Torrey's orders. Now this is very

material to be considered; for the loss, whatever it is, must be borne exclusively by the plaintiffs. On the other hand, if the defendants are not entitled to retain the damages for the 700 pezzos, against the plaintiffs, still, if Torrey has broken his contract with the defendants, by not permitting the advance to be made, they have a perfect remedy over against him.

First, it is said, that the bill of lading accompanying the consignment of Torrey's shipment states, that freight is to be paid "as per agreement." But what agreement? The defendants say, that the agreement must be that, which they state in the postscript of their letter of the 15th of September, and in the master's instructions for the voyage. But there is no proof, that these instructions were ever seen by the plaintiffs. The postscript was seen by them. But as there is no reference to any particular agreement, and no written agreement was produced under the hands of the parties, there is no ground to say, that the agreement, under which the plaintiffs were to act, was any more that stated in the postscript, than that stated in their own orders from Torrey. Nor are the terms of the agreement so differently set forth by the postscript and the orders as to be wholly irreconcilable with each other. The 700 pezzos were to be advanced at Leghorn. But the advance, though stated in general terms in the postscript, might still be fairly understood by the plaintiffs as conditional and discretionary, as stated in the orders. And it was their duty to act in a manner, if possible, reconcilable with both. If the parties have, by their neglect to sign joint orders, placed the plaintiffs in a situation to act, and yet they may mistake what is their duty, ought a court of equity to hold them responsible, as if they had been themselves guilty of gross laches and wilful disobedience of orders?

But it is next said, that, if the orders were incompatible, the plaintiffs should have rejected all the consignments both of ship and cargo, and thus have protected themselves from responsibility. I exceedingly doubt, whether, under the circumstances, they would have been justified in so doing; and if the defendants had sustained any injury from their refusal, it would have been difficult to have exonerated themselves from the payment of damages. Because they could not carry into effect all the contracts of all the parties, they were not bound to reject all. And if they were at liberty to accept the consignments of Messrs. Atkinson & Rollins, and others, there is no ground to say, that they were bound to reject the consignment of Torrey. The argument for rejection goes, as it seems to me, to the whole consignments, if to any. But if they might have rejected all, or a part, still the inquiry is, whether they were bound so to do? I think they were not. They had a right to receive the other consignments, and also that of the vessel,

in order to reimburse themselves, for their purchases already made, and to be made, of tiles and paper. And if they had refused the consignments, there is no pretence to say, that they were bound to supply the tiles and paper. The rejection would have been owing to a neglect on the part of the defendants, or of the shippers, and not of the plaintiffs. But I do not accede to the doctrine advanced at the bar, that, where there is a consignment of ship and cargo, belonging to different persons, and the ship-owner construes his contract one way, and the shippers another way, the consignees are bound at their own peril to settle on the spot the rights of the parties. My opinion is, that the consignees are bound to obey the orders of the consignor, and not of the ship-owner, if there be any discrepancy between them. It is true, that the ship-owners are not bound to deliver the goods unless the consignees agree to pay freight, &c., according to the contract between them and the shippers. And they may insist upon an absolute agreement to this effect on the part of the consignees, before the delivery, if there be any dispute as to what the contract is; and the consignees will be then bound by their own agreement. But where no such dispute is known or understood at the time of the delivery, and it passes sub silentio, then the consignees cannot protect themselves in disobeying the orders of the consignors. They are bound to pursue them; and if any injury arises to the other side, the remedy lies against the consignors, and not against the consignees. In the present case there is no evidence to show, that the master of the Halcyon demanded back Torrey's sugars, or that he expressed dissatisfaction with the conduct of the consignees under the circumstances. It is true, that the defendants, in their letter of the 18th of April, 1825, do complain to the plaintiffs of their breach of orders in not investing the 700 pezzos, as well as the other funds. But the plaintiffs, in a reply of the 27th of June, 1825, state the reason. "The sum of 700 pezzos, which were to be advanced here, on account of half profits of the Halcyon cargo of sugar, not having been due from a default of profits, we considered ourselves authorized to act with a discretionary power, otherwise be assured, that we never deviate from orders." No reply was ever made by the defendants to this letter. And this, to some extent at least, furnishes a presumption in favor of their acquiescence in the fairness of the plaintiffs' conduct, though its legal correctness may not have been admitted.

There is another consideration not wholly immaterial. As the postscript was not communicated to the plaintiffs until the arrival of the brig, they had no means of knowing, or even of conjecturing, that there would be any discrepancy between the contract, as understood by Torrey and by the defendants. It was too late then to consult either party;

for the delay would have been equivalent to a loss of the voyage. The plaintiffs, then, were compellable to act in a new emergency; and their conduct, if bona fide, is certainly entitled to great indulgence. It does not appear that Messrs. Murdock, Storey, & Co., the shipper's agents at Havana, made any communication to the plaintiffs on the subject; so that they were left wholly to thread their way by the light of the orders of Torrey and the postscript. The ground of recovery for the non-investment of the 700 pezzos certainly was, that there was no proof, that the advance was not absolutely ordered by the consignor of the shipment. If it had appeared otherwise, I am free to say, that I should have given a different direction to the jury on this point. It seems to me, that where an agent receives orders from the consignor giving one interpretation to the contract, and from the ship-owner giving a different interpretation, he is not required to reject the consignment; but he may receive it and . act for the benefit of both parties, and remit the question, for them to decide it for themselves. I do not think he is bound to involve himself in a law-suit by a breach of the orders of the consignee. In the present case, if it stood before the jury, as it now does, I should be of opinion, that, however equitable might be the claim for damages by the defendants against Torrey, that claim ought not to be sustained against agents, who have acted bona fide, and without any wilful act done in breach of their duty.

The remaining question is, whether, the recovery having been had perfectly justifiably by the defendants upon their own view of the case, the plaintiffs have now any right to relief against the full effect of that judgment. I agree entirely to the doctrine, that, if the defendants have had full knowledge and means of making a complete defence, and have omitted so to do, that furnishes no ground for a new trial at law or in equity. This, however, is not the case of an application for a new trial, either at law or in equity. It is an application for an injunction pro tanto to the judgment for what is not conscientiously due from the plaintiffs, however conscientiously the defendants might deem themselves entitled to retain it. The language of the court in the case of Marine Ins. Co. v. Hodgson, 7 Cranch, [11 U. S.] 332, 2 Pet. Cond. Rep. 516, seems to me to contain so cogent and clear an exposition of the true principles, which ought to govern a court of equity on this subject, that it is useless to go farther into the authorities upon the general doctrine. The ground of the present bill is, that the plaintiffs were taken by surprise at the trial, and had no opportunity to avail themselves of the defence, which they now set up; that they have been guilty of no negligence; and that they have lost their cause from sheer mistake and ignorance of the nature and extent of the claim against them.

The first question is, whether the plaintiffs had any notice of the claim on account of the non-investment of the 700 pezzos. No notice in pais, that it was contemplated in the suit, is established. But the defendants insist, that they always did contemplate it as a part of their demand, and that it is covered by the counts in their declaration, and therefore constructively brought home to the knowledge of the plaintiffs. The suit was originally brought in the state court in 1827, and was removed into the circuit court, and came on for trial at October term, 1828. The original declaration contained, besides the money counts, only one special count, and that was in the most general form, alleging that Bell, De Youngh & Co. had undertaken, out of certain funds of Messrs. Cunningham, Loring & Co., to purchase for them at Leghorn upon commission, 2200 pezzos in value of marble tiles of certain specified dimensions, and had broken their contract. Upon the trial, it appearing to the court, that the special agreement produced in evidence was not sufficiently set forth, the then plaintiffs obtained leave to amend, and filed three new counts, upon which a trial was had at the same term. The first new count is in substance founded on the original letter of the 15th of September, 1824, and recites it, without any allusion whatever to the postscript, and avers the freight-money recovered to have been, (under a videlicet,) 3449 pezzos, and a neglect to make the investment. The second new count states the voyage to Havana, the leaving of goods there to be carried from thence to Leghorn, on freight for certain moneys to be paid by the owners thereof to the then plaintiffs, and their intention to invest at Leghorn 2200 pezzos of such moneys, so to be received, in marble tiles, &c., the residue of such moneys, after deducting disbursements, in wrapping-paper, and a promise of the then defendants out of such moneys to make the purchases accordingly. It then avers, that a large sum became due, payable at Leghorn to the then plaintiffs, for the freight of the said goods, to wit, 3439 pezzos, which was received by the then defendants, and alleges a breach in the non-investment. The third new count alleges the contract to be, that heretofore, to wit, on the 9th of December, 1824, the then defendants had in their hands a large sum of money, to wit $5000, the property of the then plaintiffs; and the then defendants undertook to purchase for the then plaintiffs 2200 pezzos in value of marble tiles &c., and to invest the residue thereof, after deducting disbursements, in wrapping-paper, &c., &c.; and then proceeds to state a breach by non-investment, by which the then plaintiffs had sustained damages to the amount of $7000.

The original declaration certainly contained no count adapted to make out a case under the postscript. And it does not appear to me, that the first or second new counts, in the manner in which they are actually framed, can cover any claim for the non-investment of the 700 pezzos. They seem to me exclusively adapted to meet the case of the non-investment of the funds under the original letter, independent of the postscript. The only count, which seems entitled to cover the 700 pezzos, is the third new count; and unless my recollection misleads me, this was the count, on which the right to recover was, at the trial, mainly, if not exclusively rested. Now, it cannot escape observation, that this count is very general in form, and conveys not the slightest information as to any particulars of the funds. The gravamen, which it principally purports to insist upon, is the non-investment of the 2200 pezzos in marble tiles, and the statement of the funds is under a videlicet, and merely introductory. Had, then, the plaintiffs any reason to suppose, that they constituted a part of the claim of Messrs. Cunningham, Loring & Co. against them? I do not ask, whether the latter contemplated it as a part of their claim; for that may be admitted, and yet the posture of the case be not changed. I am of opinion, that there is no evidence in the case, that could reasonably lead the plaintiffs to such a conclusion. It is true, that Messrs. Cunningham, Loring & Co. did, in their letter of the 18th of April, 1825, complain to the plaintiffs of the non-investment of the 700 pezzos, as a grievance. But the plaintiffs in their reply of the 27th of June, 1825, already alluded to, stated, that the advance of the 700 pezzos was to be conditional and discretionary, in case there were half profits. The omission on the part of Messrs. Cunningham, Loring & Co. to reply to that statement, would naturally lead the plaintiffs to presume, that so far at least they acquiesced in the justification set up by them. And the original declaration gave no notice of any different intention. And there is no pretence to say, that, by any other matters in pais, the plaintiffs had any special notice of this claim being insisted on.

Now even supposing the new counts gave the most perfect notice of the claim at the trial, it is most manifest, that the plaintiffs could not be apprized of it; for they were in a foreign country, and utterly without any conusance of the proceedings at the trial. The new counts were filed after the trial commenced, and a delay of a short period only was allowed before the trial was again resumed. I have no right to refer to my own recollection of the occurrences at the trial. But it has been stated at the bar, and admitted to be correct, that although Messrs. Cunningham, Loring, & Co. insisted, that they had always intended to make this claim, the counsel for Messrs. Bell, De Youngh, & Co. expressed an utter surprise at the information, and asserted his prior ignorance of any such claim. And it is not now denied, that such was the fact on his part. And it is

not controverted, that, at that time, he had not the slightest knowledge of the orders of Mr. Torrey, so as to enable him to avail himself of that defence.

What, then, is the case before the court? Foreigners are sued in an action, which gives them no notice of the particular claim. Their counsel, the foreigners being resident abroad, go to trial upon the declaration, as it stands, and that declaration is not supportable. New counts are filed, by leave of the court, which cover a claim not before embraced in the actual frame of the declaration. The foreigners have no notice of it, and of course no means of instructing their counsel on any point of defence. The trial immediately proceeds, and a verdict is obtained, which upon facts, which could have been supplied upon due notice by the foreigners, would not have been recovered according to the principles of law. Upon such a case, where the recovery must be, if maintained, a final loss to the parties; where they can receive no ulterior remedy; where they acted merely as agents, bona fide, and according to the orders of their principal; can there be a doubt, that a court of equity ought to furnish redress? It is a case of substantive, unqualified surprise. Even courts of law do not hesitate to grant new trials in cases of surprise. It is a case of persons abroad, who are necessarily compelled to rely on counsel at a distance, and without the means of immediate communication with them. And in such cases, courts of law look with more indulgence in granting new trials, even where the attorney may not be presumed to be wholly without negligence, and more diligence might have brought the proper defence to his knowledge, the papers being in his possession. Broadhead v. Marshall, 2 W. Bl. 955; Grant, N. Trials, 132, 115.

Looking, then, to the case, as it is now presented to the court, I feel, that I am doing no more than what every court of equity would, under like circumstances, feel itself bound to do; to grant relief, and a perpetual injunction as to so much of the judgment, as is covered by the damages given on account of the non-investment of the 700 pezzos. This is readily ascertained by mere computation, and applying the rule of proportion. I make this decree without the slightest intention of suggesting, that the defendants have insisted upon a hard and unconscionable verdict, or have been wanting in all due equity. They have sustained great losses by the misconduct of the plaintiffs in not complying with their orders; and might fairly enough claim to retain any sum, which was not beyond those losses. And, inasmuch as they have been in no default, I do not see that they ought to be deprived of their costs in this suit.